UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

IN THE MATTER OF THE *EX PARTE*
APPLICATION OF THE UPPER BROOK
COMPANIES FOR AN ORDER DIRECTING
DISCOVERY IN AID OF A FOREIGN
PROCEEDING PURSUANT TO 28 U.S.C. § 1782

------------------------------------------------------------x

22-mc-97 (PKC)

OPINION AND ORDER

CASTEL, U.S.D.J.

On April 11, 2022, this Court granted an ex parte application brought by the

Upper Brook Companies to take discovery in aid of a foreign proceeding (the "April 11 Order").

28 U.S.C. § 1782.  The Upper Brook Companies seek documents from JPMorgan Chase Bank,

N.A. ("JPMorgan"), pertaining to an account held by Palladyne International Asset Management

("PIAM").

PIAM moves to vacate the April 11 Order and to quash the subpoena issued to

JPMorgan.  It argues that the Upper Brook Companies have not satisfied the mandatory criteria

of section 1782 because the discovery sought is not "for use" in a foreign proceeding.  It further

urges the Court to exercise its discretion to deny the Upper Brook Companies' application.  In

the event the Court denies the motion to vacate and quash, PIAM requests that the Court narrow

the scope of discovery and issue a protective order.

As will be explained, the Upper Brook Companies have satisfied the mandatory

factors of section 1782, and the discretionary factors set forth in Intel Corp. v. Advanced Micro

Devices, Inc., 542 U.S. 241, 264-65 (2004), weigh in favor of the application.  PIAM's motion to

vacate and quash will therefore be denied.  However, the Court will modify the scope of

discovery and enter a protective order.

1

BACKGROUND

      The Upper Brook Companies are three funds that were incorporated by PIAM, a Dutch investment management firm, under the laws of the Cayman Islands.[1]  (Doc 1 at 1.) PIAM served as the sole executive director of each fund's Board of Directors.  (Id.; Doc 3 at 8.) In 2006 and 2007, three entities associated with the Libyan government – the Libyan Investment Authority, Libyan African Investment Portfolio, and Libyan Foreign Bank (collectively, the "LIA") – invested a total of $700 million with the Upper Brook Companies ("the Upper Brook Assets").  (Doc 1 at 2; Doc 3 at 8; Doc 27 at 5.)  The Libyan Investment Authority is the Libyan state's sovereign wealth fund, and it "owns or controls all three of the Upper Brook Companies." (Doc 3 at 8 n.8.)  In connection with these investments, the Upper Brook Companies entered into written investment management agreements with PIAM.  Pursuant to those agreements, PIAM, as investment manager, was entitled withraw fees totaling approximately 2.5% annually of the value of the assets under management.  (Doc 27 at 5.)

      After the overthrow of the Muammar Gaddafi government in Libya in 2011, "the Upper Brook Assets were frozen by international sanctions."  (Doc 3 at 8; see also Doc 27 at 5.) According to the Upper Brook Companies, in 2012, PIAM formed a Dutch foundation (Palint) and then transferred "98.5% of the Upper Brook Assets to Palint."  (Doc 3 at 8-9; Doc 4, Ex. 10 ¶ 2.3.1.)  Palint then moved the funds into "new accounts in Palint's own name at Deutsche Bank" but gave PIAM full control.  (Doc 3 at 9.)

      In 2013, law enforcement agencies in the Netherlands and Switzerland and prosecutors in Libya began investigating allegations that PIAM and its founder "had engaged in

---

[1] The three entities were initially incorporated under the following names: Palladyne Global Balanced Portfolio Fund, Palladyne Global Advanced Portfolio Fund, and Palladyne Global Diversified Portfolio Fund Limited.  The entities were later renamed and are now known (and will be referred to here) as Upper Brook (A), Upper Brook (F), and Upper Brook (I), respectively.  (See Doc 1 at 1 n.1; Doc 3 at 7-8.)

money laundering and other financial crimes in connection with the management of the Upper Brook Companies."[2]  (Id.)  As a result, in July 2014, the LIA removed PIAM from the board of directors of each of the Upper Brook Companies and appointed new board members.  (Id.)

PIAM describes that two individuals, "Messrs Baruni and Jehani," took control of the Upper Brook Companies in 2014.  (Doc 27 at 6.)  According to PIAM, Baruni and Jehani "belong to one of two factions that have sought to gain control over Libyan sovereign assets held outside Libya" and have been "engaged in a campaign seeking to oust [PIAM] and take control of the assets [PIAM] holds for the Libyan state and its people."  (Id.)  PIAM maintains that the "usurpation of control" by Baruni and Jehani violated international sanctions.  (Id.)  On the other hand, the Upper Brook Companies claim that "PIAM had strong ties to a senior member of the Gaddafi regime in Libya."  (Doc 1 at 2; Doc 3 at 8.)

The Upper Brook Companies state that they terminated their investment agreements with PIAM in 2014, after which point PIAM was no longer entitled to withdraw funds from the accounts.[3]  (Doc 3 at 9.)  They assert that, despite termination of the agreements, PIAM and Palint (together, the "PIAM Entities") unlawfully diverted tens of millions of dollars in "management fees" from the Upper Brook Assets to PIAM.  (Id.)

The Upper Brook Companies later commenced legal proceedings in the Netherlands to recover the allegedly diverted funds ("the Netherlands Proceedings").  (Doc 1 at 2; Doc 3 at 9, 9 n.11.)  The Upper Brook Companies have also commenced related proceedings "seeking to replace the Board of Directors of Palint, and to obtain [the Upper Brook Companies']

---

[2] PIAM notes that no charges have ever been brought against it.  (Doc 27 at 6 n.2.)
[3] In PIAM's view, the Upper Brook Companies "purported to terminate" the agreements once Baruni and Jehani gained control.  (Doc 27 at 6.)

books and records which are in the possession of the PIAM Entities," ("the Related Proceedings").  (Doc 1 at 2; Doc 3 at 9 n.11.)

There are three "Netherlands Proceedings."  In 2016, one of the Upper Brook Companies, Upper Brook (I), sued the PIAM Entities seeking to recover the "management fees" that the PIAM Entities allegedly wrongfully withdrew after Upper Brook (I) terminated its agreement with PIAM.  (Doc 3 at 10; Doc 27 at 8-9.)  The Amsterdam District Court held in February 2021 that the PIAM Entities' withdrawals of management fees after the termination date were made without any legal basis.  (Doc 3 at 10-11.)  The court ordered the PIAM Entities to repay these sums to Upper Brook (I).  (Id. at 11; Doc 27 at 9.)  PIAM appealed the decision, but the Amsterdam Court of Appeals has not yet rendered a decision on the merits.[4]  (Doc 3 at 12; Doc 27 at 9.)  The amount sought remains unpaid.

In April 2021, the two other Upper Brook Companies, Upper Brook (A) and Upper Brook (F), filed similar actions seeking the amount that the PIAM Entities withdrew from those accounts since July 2014.  (Doc 3 at 13; Doc 27 at 9.)  The Upper Brook Companies estimate the allegedly diverted funds "exceed sixty-two million dollars" but claim "the PIAM Entities have not provided documents to [them] which would permit them to confirm these figures."  (Doc 3 at 14.)

In support of the Upper Brook Companies' present application, Ernst & Young LLP ("EY") analyzed available financial documents and confirmed that PIAM caused tens of millions of dollars to be transferred from the Upper Brook Companies to PIAM between 2007 and the time of the application, and that the PIAM bank account that received these payments was maintained at Rabobank in the Netherlands (the "Rabobank Account").  (Id.; see also Doc

---

[4] On March 29, 2022, the Amsterdam Court of Appeals "deferred a final decision on the merits" and "maintained the status quo for Upper Brook (I) and PIAM."  (Doc 3 at 12.)

5.)  EY also reviewed a report prepared by Dutch law enforcement describing agreements PIAM entered into with entities linked to the Gaddafi government to provide those entities with two-thirds of the management fees that PIAM obtained from the Upper Brook Companies.  (Doc 3 at 14; Doc 5 ¶¶ 24-27.)  It also confirmed that JPMorgan was the Correspondent Bank for Rabobank during the relevant time period and that JPMorgan "should have documents reflecting the US dollar transactions flowing into and out of the [Rabobank Account]."  (Doc 3 at 14-15; Doc 5 ¶¶ 32-33.)

On March 30, 2022, the Upper Brook Companies filed an ex parte application pursuant to 28 U.S.C. § 1782 seeking all documents in JPMorgan's possession, custody or control regarding U.S. dollar transactions, since 2007, into and out of the Rabobank Account (the "Discovery").  (Doc 1 at 2-3; Doc 3 at 6.)

The Court granted the Upper Brook Companies' application in its April 11 Order and issued a subpoena to JPMorgan.  (Doc 13.)  On May 10, 2022, PIAM filed a motion to vacate the April 11 Order and to quash the subpoena issued to JPMorgan.  (Doc 24.)  Notably, JPMorgan, the entity to whom the subpoena is addressed, has not moved to vacate.

DISCUSSION

I.   The Mandatory and Discretionary Factors of 28 U.S.C. § 1782.

The Upper Brook Companies assert that PIAM's motion should be denied because PIAM did not move to intervene in this action and therefore has not established that it has standing to challenge the subpoena.  (Doc 28 at 25 n.8.)  However, "standing to oppose subpoenas issued under § 1782 is [not] limited to the subpoenaed witness."  Application of Sarrio, S.A., 119 F.3d 143, 148 (2d Cir. 1997).  "[P]arties against whom the requested

information will be used may have standing to challenge the lawfulness of discovery orders directed to third parties." Id. (citing cases); see also In re Hornbeam Corp., 14-mc-424, 2015 WL 13647606, at *2 (S.D.N.Y. Sept. 17, 2015) (concluding that the party against whom the requested discovery would be used had standing to challenge the issuance of section 1782 subpoenas and that it was therefore unnecessary for the court to determine whether the party satisfied the requirements for intervention under Rule 24, Fed R. Civ. P.); In re Tiberius Grp. AG, 19-mc-467, 2020 WL 1140784, at *9 (S.D.N.Y. Mar. 6, 2020) (deciding motion to quash on the merits where parties to a foreign proceeding objected to the issuance of section 1782 subpoenas to non-party banks but did not file a motion to intervene).

Turning to the merits, a district court may, "upon the application of any interested person," order a person within its jurisdiction to "give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . ." 28 U.S.C. § 1782(a). In order for a court to grant a section 1782 application, three mandatory factors must be satisfied: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." Mees v. Buiter, 793 F.3d 291, 297 (2d Cir. 2015) (quoting Brandi-Dohrn v. IKB Deutsche Industriebank AG, 673 F.3d 76, 80 (2d Cir. 2012)).

Once those statutory requirements are met, the court may grant or deny discovery in its discretion. Mees, 793 F.3d at 297, 301. The court's "discretion, however, is not boundless" – it must be guided by the twin goals of "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by

6

example to provide similar means of assistance to our courts." Id. at 297-98 (quoting Schmitz v. Bernstein Liebhard & Lifshitz, LLP, 376 F.3d 79, 83-84 (2d Cir. 2004)).

In Intel, the Supreme Court identified four factors for a court to consider in exercising its discretion: "(1) whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case the need for § 1782(a) aid generally is not as apparent; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the request is unduly intrusive or burdensome." Id. at 298 (quoting Intel, 542 U.S. at 264-65 (internal quotations omitted)). These factors are "guides for the exercise of" discretion and "are not to be applied mechanically." Intel, 542 U.S. at 263 n.15; Kiobel by Samkalden v. Cravath, Swaine & Moore LLP, 895 F.3d 238, 245 (2d Cir. 2018). The Second Circuit has clarified that the four factors are "non-exclusive" and the district court "should also take into account any other pertinent issues arising from the facts of the particular dispute." Kiobel, 895 F.3d at 244-45.

II.    The Upper Brook Companies Have Satisfied the Mandatory Factors.

PIAM does not dispute that JPMorgan resides in this District or that the Upper Brook Companies are an "interested person" relative to the ongoing foreign proceedings. The only mandatory factor at issue is whether the Discovery sought is "for use" in a foreign proceeding.

In order to show that materials requested in a section 1782 application are "for use" in a foreign proceeding, an applicant must demonstrate that the discovery "will be employed with some advantage or serve some use in the proceeding."  Mees, 793 F.3d at 298. The Second Circuit instructs that the "key question . . . is not simply whether the information sought is relevant" to the foreign proceeding, "but whether the [applicant] will actually be able to use the information in the proceeding."  Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P., 798 F.3d 113, 120 (2d Cir. 2015) (emphasis in original).  The focus is "on the practical ability of an applicant to place a beneficial document – or the information it contains – before a foreign tribunal."  In re Accent Delight Int'l Ltd., 869 F.3d 121, 131 (2d Cir. 2017).  Though relevance alone is not sufficient to authorize the district court to order discovery, it "may be necessary" for the court to consider the relevance of the information sought "insofar as it is difficult to conceive how information that is plainly irrelevant to the foreign proceeding could be said to be 'for use' in that proceeding."  KPMG, 798 F.3d at 120, 120 n.7.

There is no requirement that the materials sought be necessary to the applicant's ability to prevail in the foreign proceeding.  Mees, 793 F.3d at 298.  The materials also need not be discoverable or admissible in the foreign proceeding – the foreign court is "free to exclude the evidence or place conditions on its admission."  Brandi-Dohrn, 673 F.3d at 77, 82.

The Upper Brook Companies assert that the Discovery will be used in three categories of foreign proceedings: (1) the ongoing Netherlands Proceedings and Related Proceedings, (2) additional litigation the Upper Brook Companies "reasonably contemplate" bringing against the PIAM Entities and others, and (3) investigations by foreign law enforcement agencies into the conduct of the PIAM Entities.  (Doc 1 at 3-4.)  Because the Court concludes that the Upper Brook Companies have demonstrated the Discovery is "for use" in the ongoing

Netherlands Proceedings and Related Proceedings, it need not address the parties' arguments regarding the reasonably contemplated future litigation and law enforcement investigations.

The Upper Brook Companies offer five ways in which they plan to use the Discovery in the ongoing Netherlands Proceedings and Related Proceedings. First, they intend to use the Discovery to "confirm[] and/or identify[] each of the schemes employed by the PIAM Entites to divert funds from the Upper Brook Companies." (Doc 1 at 3; Doc 3 at 21-22.) By contrast, PIAM argues that the requested records "will shed no further light" on any alleged diversions because the "only 'scheme' at issue in the Dutch proceedings is the undisputed fact" that PIAM continued to charge management fees after 2014 and the Dutch court already determined that this "scheme" took place. (Doc 27 at 10.)

PIAM's argument misses the mark. The relevant issue is not whether the Upper Brook Companies <u>need</u> the Discovery to confirm or identify the wrongful withdrawals. <u>See</u> <u>Mees</u>, 793 F.3d at 298 (materials sought need not be necessary to applicant's ability to prevail in the foreign proceeding). The question is whether the Upper Brook Companies "will actually be able to <u>use</u> the information in the proceeding." <u>See</u> <u>KPMG, L.L.P.</u>, 798 F.3d at 120. The Court is satisfied that the Upper Brook Companies have demonstrated a "practical ability" to place the "beneficial" bank records and the information they contain before the Dutch courts. <u>See</u> <u>In re</u> <u>Accent Delight Int'l</u>, 869 F.3d at 130. PIAM makes no argument that the Upper Brook Companies are "not in a position" to have the Dutch courts consider evidence of the "schemes employed" or that they have no "means of injecting the evidence into the proceedings." <u>See</u> <u>KPMG</u>, 798 F.3d at 120-21. Moreover, the records are not "plainly irrelevant" to demonstrating that the wrongful withdrawals took place. <u>See</u> <u>KPMG</u>, 798 F.3d at 120, 120 n.7. Accordingly, this asserted purpose of the Discovery satisfies the "for use" requirement.

Second, the Upper Brook Companies intend to use the Discovery "to calculate the precise dollar amount" of the withdrawn management fees.  (Doc 28 at 13.)  This calculation would inform the damages calculation in each of the three Netherlands Proceedings.  (Id. at 13-14.)  With respect to the Upper Brook (I) proceeding that is on appeal, the Upper Brook Companies explain that the Discovery will still be useful because the Dutch court "was only able to estimate that the sum diverted by PIAM totaled $15.6 million."  (Id. at 13.)  They state, "[t]he Discovery will help Upper Brook (I) to confirm the accuracy of this estimate and, if warranted, seek an amendement to the claim against the PIAM Entities to correct the damages calculation while the case is on appeal (as it is now) or after the appeal has concluded."  (Id. at 13-14.)

Here too, PIAM claims that the Discovery is not necessary to achieve the Upper Brook Companies' aim.  PIAM asserts that the Upper Brook Companies already have access to a variety of documents that reflect the amount of the management fees.  (Doc 25 ¶¶ 2-4; Doc 27 at 10; Doc 31 at 5.)  Regardless of whether or not those documents are in fact sufficient,[5] the Discovery need not be necessary to the Upper Brook Companies' ability to prove the precise amount of the fees.  See Mees, 793 F.3d at 298.  The Upper Brook Companies have shown that the JPMorgan records would "be employed with some advantage or serve some use" with respect to determining the amount of fees.  See id.

The Court is similarly unpersuaded by PIAM's claim that the Discovery will not be useful to the fee calculation because the "account records from J.P. Morgan, acting as the correspondent bank for [PIAM's] corporate bank account in the Netherlands," will not show the

---

[5] As will be discussed further under the fourth Intel factor, the Upper Brook Companies argue that the documents to which they have been granted access suffer from "gaps" and "shortcomings" and rely on the integrity of PIAM's own bookkeeping and document recovery practices.  (Doc 28 at 22; Doc 30 ¶¶ 5-11; see also Doc 3 at 14 ("[T]he PIAM Entities have not provided documents to [the Upper Brook Companies] which would permit them to confirm these figures.").)

amount of management fees deducted from Upper Brook (I)'s own account.  (See Doc 32 ¶ 2.)
Presumably, the records would show the amounts as inbound transfers to PIAM's account.
PIAM is free to argue before the Dutch courts that JPMorgan's records are not a "particularly
appropriate way to seek confirmation of the sums deducted as fees."  (See Doc 31 at 5; see also
Doc 27 at 10.)

   Third, the Upper Brook Companies plan to use the Discovery to identify "the
destination and/or location" of the allegedly diverted fees.  (Doc 1 at 3.)  PIAM argues that
outbound transfers by PIAM to third parties are not relevant to the Upper Brook Companies'
claims that the fees were improperly collected.  (Doc 27 at 10-11; Doc 32 ¶ 2.)  However, the
Upper Brook Companies explain that the Discovery would allow them to identify third parties
from whom they will seek to recover the funds as well as those "with evidence relevant to the
Netherlands Proceedings and Related Proceedings, including third parties who participated in
and benefited from the scheme."  (Doc 28 at 14-15.)  The Court finds this to be a plausible use of
the Discovery – whether the Upper Brook Companies' efforts will be fruitful or ultimately
accepted by the Dutch courts is not for this Court to say.

   Fourth, the Upper Brook Companies assert that the Discovery will help them
refute a counterclaim that PIAM has asserted in the Netherlands Proceedings, namely, that PIAM
has "continued to fulfil its role as manager of the Funds" since 2014 and has "taken on a
caretaker role" and is "protecting the assets of the State Investors" and the Libyan people.  (Id. at
15.)  They explain that the "Discovery is expected to confirm Dutch law enforcement findings
that PIAM has been corruptly sharing its 'management fees' with third parties connected to the
Gaddafi regime."  (Id.)  The Upper Brook Companies plan to use this evidence to show that

PIAM has not been serving as a "caretaker" and is therefore not entitled to recover on its counterclaim.  PIAM has not responded to this anticipated use of the Discovery.

Fifth, the Upper Brook Companies state that the Discovery will be used in the Related Proceedings to support their "claims that the Board of Directors of Palint, through their involvement in the diversion of the Petitioners' funds (while these funds were in the custody of Palint), engaged in and/or ignored misconduct, and should therefore be removed from their positions."  (Doc 28 at 16.)  PIAM has not refuted this anticipated use either.

Based on the foregoing, the Court concludes that the Upper Brook Companies have satisfied the "for use" requirement.  They have shown that the records sought are relevant to the pending foreign proceedings and that they have the ability and intention to use the Discovery in the Netherlands Proceedings and Related Proceedings.

III.    The Discretionary _Intel_ Factors Weigh in Favor of Discovery.

Having concluded that the Upper Brook Companies' application satisfies the mandatory factors of section 1782, the Court must next exercise its discretion to determine whether the application should be granted or denied.  The Court concludes that the Intel factors and the twin goals of section 1782 support granting the requested Discovery.

1.   Factor One: Whether JPMorgan Is a Participant in the Foreign Proceedings.

The first Intel factor considers "whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case the need for § 1782(a) aid generally is not as apparent."  Mees, 793 F.3d at 298 (quoting Intel, 542 U.S. at 264) (internal quotations omitted).  JPMorgan is not a party to the ongoing Netherlands Proceedings or Related

Proceedings.[6]  (See Doc 1 at 4.)  PIAM does not dispute these facts.  (See Doc 27; Doc 31.).  As

such, the first factor weighs in favor of the Upper Brook Companies' application.

    2.   Factor Two: Nature of the Foreign Tribunal, Character of Foreign
           Proceedings, and Receptivity to Assistance from United States Federal Courts.

The second Intel factor considers "the nature of the foreign tribunal, the character

of the proceedings underway abroad, and the receptivity of the foreign government or the court

or agency abroad to U.S. federal-court judicial assistance."  Mees, 793 F.3d at 298 (quoting Intel,

542 U.S. at 264) (internal quotations omitted).

 According to the Upper Brook Companies, "courts in the Netherlands are

receptive to discovery obtained through Section 1782."  (Doc 1 at 4; Doc 7 ¶ 11; Doc 3 at 25-

26.)  They have provided a declaration from their counsel in the Netherlands stating that "[t]he

Dutch Supreme Court held that evidence obtained using Section 1782 discovery may be used in

proceedings before their national courts in Alfred Mol v. Kinetics Technology International

B.V., Supreme Court [Hoge Raad], February 6, 1998)."  (Doc 7 ¶ 11; Doc 3 at 25.)

PIAM does not refute these statements, but it nevertheless asserts that this factor

"weighs heavily against granting" disclosure because the Dutch courts already denied the Upper

Brook Companies' request for broad access to PIAM's business records.  (Doc 31 at 11.)  This

denial, it claims, "undermines" the notion that the Dutch courts will be receptive to the

Discovery sought here.  (Id.)

However, the Upper Brook Companies explain that the Dutch court's decision

merely denied their "request to obtain the access codes and password for PIAM and Palint's

online banking systems at Deutsche Bank."  (Doc 28 at 23.)  The court denied the request

---

[6] Since the Court has not addressed the parties' arguments regarding the reasonably anticipated future litigation and law enforcement investigations, it will similarly limit its analysis of the discretionary factors to the ongoing Netherlands Proceedings and Related Proceedings.

because the "digital infrastructure Deutsche Bank created for PIAM as investment manager . . . . is only intended to be used for the investment manager and PIAM's clients do not have access thereto." (Doc 7 ¶ 9.) The Upper Brook Companies state that the court's decision was designed to avoid disclosure of the "relationships between the PIAM Entities and any other clients they might have." (Doc 7 ¶ 10.) In light of these details, the decision suggests nothing about the Dutch courts' receptivity to disclosure obtained through the present application.

Accordingly, the Court concludes that the second factor weighs in favor of the Upper Brook Companies' application. See In re Hulley Enters., Ltd., 358 F. Supp. 3d 331, 347 (S.D.N.Y. 2019) (concluding that the second Intel factor favored production of documents based on petitioners' showing that "Dutch law permits the submission of evidence collected through section 1782"), aff'd sub. nom. In re Hulley Enters., Ltd., 400 F. Supp. 3d 62 (S.D.N.Y. 2019).

3.  Factor Three: Whether the Application Conceals an Attempt to Circumvent Dutch Proof-Gathering Restrictions or Policies.

The third Intel factor considers whether the application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." Mees, 793 F.3d at 298 (quoting Intel, 542 U.S. at 264-65) (internal quotations omitted).

The Second Circuit has instructed that "proof-gathering restrictions" "are best understood as rules akin to privileges that prohibit the acquisition or use of certain materials." Mees, 793 F.3d at 303 n.20 (emphasis in original). As such, "there is a difference between a § 1782(a) request that seeks documents that cannot be obtained in a foreign proceeding because the foreign jurisdiction does not provide a mechanism for such discovery, and one that seeks documents that cannot be obtained because the foreign jurisdiction prohibits the discovery of

14

those documents." In re Accent Delight Int'l Ltd., 791 F. App'x 247, 251 (2d Cir. 2019) (summary order) (emphasis in original).

The fact "[t]hat a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means." Mees, 793 F.3d at 303 n.20.  The Second Circuit has observed that "[f]ew if any foreign jurisdictions permit the scope of discovery available in [U.S.] courts," and that "[i]f district courts were free to refuse discovery based upon its unavailability in a foreign court . . . § 1782 would be irrelevant to much international litigation, frustrating its underlying purposes." Mees, 793 F.3d at 302 (quoting Metallgesellschaft AG v. Hodapp, 121 F.3d 77, 80 (2d Cir. 1997)).

In considering whether discovery would be prohibited in the foreign proceeding, the district court should not "try to glean the accepted practices and attitudes of other nations from what are likely to be conflicting and, perhaps, biased interpretations of foreign law." Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1099 (2d Cir. 1995).  Rather, the district court "should consider only authoritative proof" – based on the "forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures" – "that a foreign tribunal would reject evidence obtained with the aid of section 1782." Id. at 1100; see also In re Tiberius Grp. AG, 19-mc-467, 2020 WL 1140784, at *4 (S.D.N.Y. Mar. 6, 2020) ("Only where the materials being sought are privileged or otherwise prohibited from being discovered or used is the third Intel factor implicated.").  In keeping with these principles, "courts routinely grant § 1782 applications where the discovery sought might not be available in the foreign legal system, but is not explicitly prohibited from being acquired by way of a § 1782 application." In re Tiberius Grp., 2020 WL 1140784, at *5 (citing Gorsoan

Ltd. v. Bullock, 652 F. App'x 7, 9 (2d Cir. 2016) (summary order); In re O'Keeffe, 650 F. App'x 83, 85 (2d Cir. 2016) (summary order)).

PIAM asserts that "the Upper Brook Companies are seeking to circumvent the policies of the Dutch courts." (Doc 27 at 7, 16-17.) However, it has not identified any "authoritative proof" that the Dutch courts "would reject evidence obtained with the aid of section 1782" or any evidence that the materials sought are privileged in the Netherlands. Euromepa, 51 F.3d at 1100; Mees, 793 F.3d at 303 n.20; In re Tiberius Grp., 2020 WL 1140784, at *4. It instead points to the Dutch court's denial of the Upper Brook Companies' request for "comparable corporate records" and the fact that the Upper Brook Companies did not first seek the Discovery in the foreign proceedings.[7] (Doc 27 at 7, 16-17.) For the reasons that follow, both of these arguments fail and the Court concludes that the third factor weighs in favor of granting disclosure.

As already explained, the Dutch court denied the Upper Brook Companies' request for the access codes and password for the PIAM Entities' Deutsche Bank account because the bank's "digital infrastructure" was intended only for PIAM and not its clients. (Doc 28 at 23; Doc 7 ¶ 9.) The decision did not address disclosure of the JPMorgan records sought here, let alone provide authoritative proof that such documents are prohibited from discovery or use in the proceedings. The Court therefore disagrees that the present application is an attempt to circumvent the Dutch court's prior ruling.

In addition, the Upper Brook Companies correctly note that they had no obligation to seek the Discovery from the Dutch courts before filing their section 1782

---

[7] Specifically, PIAM argues that the Court should deny discovery because the Upper Brook Companies could "readily" obtain "[t]he evidence sought from J.P. Morgan here" in the Netherlands from Rabobank, PIAM's Dutch bank. (Doc 27 at 16.) The fact that the Upper Brook Companies have not done so, PIAM claims, is "basis for denying their application." (Id.)

application.  (Doc 28 at 22-23.)  Section 1782 does not contain an "exhaustion" requirement

requiring an applicant to seek discovery through the foreign courts before filing a section 1782

request.  Application of Malev Hungarian Airlines, 964 F.2d 97, 100 (2d Cir. 1992) (concluding

that a district court abused its discretion "to the extent [it] rested its decision to deny discovery"

on the applicants' failure to first request discovery from the foreign court).[8]  As the Second

Circuit has explained, such a requirement would be "at odds with the twin purposes" of section

1782 because it would impose "an additional burden on persons seeking assistance from our

federal courts."  Id.  "Accordingly, failure to exhaust all remedies does not demonstrate an

attempt to circumvent foreign restrictions."  In re Top Matrix Holdings Ltd., 18-mc-465, 2020

WL 248716, at *6 (S.D.N.Y. Jan. 16, 2020).

Although the Second Circuit has rejected applications in cases where the

applicant had not first sought production in the foreign proceeding, those cases involve

applicants that "have already exhausted available remedies in foreign tribunals and seek another

'bite at the apple' after having already been denied recourse."  In re Top Matrix Holdings Ltd.,

18-mc-465, 2020 WL 248716, at *6 (S.D.N.Y. Jan. 16, 2020).[9]  The Upper Brook Companies

---

[8] See also In re BNP Paribas Jersey Tr. Corp. Ltd., 18-mc-47, 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018)
("Courts may grant § 1782 applications even where the applicant did not first seek discovery in the foreign
tribunal . . . ."); In re Application of CBRE Global Investors (NL) B.V., 20-mc-315, 2021 WL 2894721, at *11 n.15
(S.D.N.Y. July 9, 2021) (applicant "was not required to attempt to obtain the materials through the foreign courts
before filing a section 1782 discovery request"); In re Aso, 19-mc-190, 2019 WL 2345443, at *7 (S.D.N.Y. June 3,
2019) ("§ 1782 does not contain an exhaustion requirement that would impose upon an applicant a duty to first seek
the requested discovery from the foreign court").

[9] See also In re Escallón, 323 F. Supp. 3d 552, 560 (S.D.N.Y. 2018) (concluding that applicant's request to order
depositions of individuals who already testified in the foreign proceedings was an attempt to circumvent foreign law
that "does not permit a second examination on the same topic"); In re WinNet R CJSC, 16-mc-484, 2017 WL
1373918, at *8 (S.D.N.Y. Apr. 13, 2017) (concluding that applicant was attempting to circumvent foreign court
rulings by seeking evidence on an issue that had already been decided, on the merits, against the applicant); In re
Mare Shipping Inc., 13-mc-238, 2013 WL 5761104, at *5 (S.D.N.Y. Oct. 23, 2013), aff'd sub nom. Mare Shipping
Inc. v. Squire Sanders (US) LLP, 574 F. App'x 6 (2d Cir. 2014) (rejecting request to compel discovery after
applicants failed to seek the evidence in the foreign proceeding during the evidence-gathering period or trial);
Aventis Pharma v. Wyeth, M-19-70, 2009 WL 3754191, at *1 (S.D.N.Y. Nov. 9, 2009) (rejecting request to compel
discovery "on the eve of an appeal" where applicant could have requested the documents in the same U.S. court
"over five years ago" and the timing of the application "place[d] a burden on [the subpoenaed party] so great that
they [could] not produce the requested documents in time for the French appeal").

are not impermissibly seeking a second bite at the apple after being "denied recourse" by the Dutch courts.  Accordingly, this factor weighs in the Upper Brook Companies' favor.

    4.   Factor Four: Whether the Request Is Unduly Intrusive or Burdensome.

The fourth Intel factor considers "whether the request is unduly intrusive or burdensome."  Mees, 793 F.3d at 298 (quoting Intel, 542 U.S. at 264-65) (internal quotations omitted).  "[A] district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure."  Id. at 302. The text of Rule 26(b)(1), Fed. R. Civ. P., provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."

"[T]o the extent a district court finds that a discovery request is overbroad, before denying the application it should ordinarily consider whether that defect could be cured through a limited grant of discovery."  Mees, 793 F.3d at 302.  However, a court may deny a section 1782 application in its entirerty if "is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials."  Id. at 302 n.18 (citing Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1101 n.6 (2d Cir. 1995)); see also Fed. R. Civ. P. 26(b)(2)(C) ("[T]he court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that . . . the discovery sought is unreasonably cumulative or duplicative . . . .").

PIAM argues that the Upper Brook Companies' application is "cumulative and duplicative" because the Upper Brook Companies have "already received information that has allowed them to quantify and verify the amount of fees."  (Doc 27 at 15-16; Doc 31 at 10.)  But PIAM overlooks the Upper Brook Companies' arguments that the Discovery will serve

18

additional purposes beyond calculating the amount of fees, such as identifying third parties with relevant evidence, refuting PIAM's counterclaim that it has been serving as a "caretaker" in protecting the assets, and supporting the Upper Brook Companies' claims against the board of directors of Palint in the Related Proceedings.

The Upper Brook Companies also note that the documents they "have already received from PIAM and third parties are based in large part on information obtained in the first instance from PIAM and rely, for their utility, on the integrity of PIAM's data input, bookkeeping and document recovery and retention."  (Doc 28 at 22 (citing Doc 30 ¶ 10).) Therefore, despite any potential redundancy, "the Discovery would still be of significant value" because it would provide "reliable, independent, third party proof of PIAM's receipt and use of funds that it diverted from the [Upper Brook Companies]."  (Doc 28 at 21-22.)  Moreover, given the "shortcomings" and "gaps" the Upper Brook Companies have identified, it is not clear that the documents they have already received are sufficient to determine the precise amount of the fees.  (Doc 30 ¶¶ 5-11; see also Doc 3 at 14 ("[T]he PIAM Entities have not provided documents to [the Upper Brook Companies] which would permit them to confirm these figures.").)  The Court therefore concludes that the Upper Brook Companies' request is not cumulative or duplicative.

PIAM also argues, for the first time in its reply, that the Upper Brook Companies' application was not made in good faith.  (Doc 31 at 12.)  It claims that the "application is the latest chapter in a campaign by a certain Libyan faction—Messrs. Baruni and Jehani—that has sought to take control of assets belonging to the Libyan Investment Authority and the Libyan people.  Messrs. Baruni and Jehani have no authority to act for the Libyan Investment Authority

or the Libyan people." (Id.) It urges the Court to decline to "exercise its discretion to assist this faction in its wrongful campaign to take control of Libyan assets." (Id.)

Notwithstanding PIAM's broad accusations, the record does not suggest any improper motive underlying the application. Any dispute regarding the authority of Baruni and Jehani to "act for the Libyan Investment Authority or the Libyan people" is not a matter for resolution by this Court. Additionally, given that the Dutch court has already held that PIAM wrongfully withdrew fees from the Upper Brook Companies, the Court sees no basis to conclude that the present application was brought in bad faith.


IV.    The Upper Brook Companies Did Not Unreasonably Delay in Filing Their Application.

Although delay in filing a section 1782 application is "not specifically listed as an Intel factor," a district court may exercise its discretion to deny a section 1782 request on the basis of delay. In re Hulley Enters., 358 F. Supp. 3d at 351, aff'd sub nom. In re Hulley Enters., 400 F. Supp. 3d 62 (S.D.N.Y. 2019); see also Nascimento v. Faria, 600 F. App'x 811, 812 (2d Cir. 2015) (summary order); Aventis Pharma v. Wyeth, M-19-70, 2009 WL 3754191, at *1 (S.D.N.Y. Nov. 9, 2009).

PIAM argues that the Upper Brook Companies' application should be denied because they "unreasonably delayed seeking U.S. disclosure." (Doc 27 at 7, 17; see also Doc 31 at 11-12.) The Court disagrees, and finds this case distinct from those in which courts have denied section 1782 discovery on the basis of delay. PIAM emphasizes that the Upper Brook Companies have known about the Rabobank Account since at least 2014, but they do not assert that the Upper Brook Companies were "first made aware that a subpoena was needed" at that time. (Doc 27 at 18); Nascimento, 600 F. App'x at 812. It was on that basis – that the applicant

had been aware of the need for a subpoena for over thirteen years – that the Second Circuit concluded the application in <u>Nascimento</u> was "inexcusably untimely."  600 F. App'x at 812.

PIAM also points to the fact that the first of the Netherlands Proceedings was commenced in 2016 and is currently on appeal from a judgment in the Upper Brook Companies' favor.  (Doc 27 at 18.)  As detailed above, however, the Upper Brook Companies have shown (1) that the Discovery can be used to correct the damages calculation while the Upper Brook (I) case is on appeal, (2) that the other ongoing proceedings are in their "early stages," (Doc 28 at 25-26), and (3) that they intend to use the Discovery in future litigation and to assist ongoing criminal investigations, (<u>id.</u> at 26).  This case therefore differs from <u>Aventis Pharma</u>, where the applicant "rush[ed] to a U.S. Court on the eve of [its own] appeal" of a foreign ruling against it and the district court concluded that allowing discovery would frustrate the goal of providing "efficient means of assistance" to participants in international litigation.  2009 WL 3754191, at *1.

Finally, there is also no evidence, nor does PIAM claim, that the timing of the Upper Brook Companies' application will unduly burden JPMorgan or PIAM.  <u>See</u> <u>In re Hulley Enters.</u>, 358 F. Supp. 3d at 351-52.  The Court therefore concludes that the Upper Brook Companies have not unreasonably delayed in bringing their section 1782 application.

In summary, the Court concludes (1) the Upper Brook Companies have satisfied the mandatory factors of section 1782, (2) the discretionary <u>Intel</u> factors favor disclosure, and (3) the Upper Brook Companies did not unreasonably delay in bringing their application.  Therefore, PIAM's motion to vacate the April 11 Order and quash the subpoena issued to JPMorgan is denied.

V.     Scope of Discovery and Protective Order.

      The Court must next address PIAM's request that in the event its motion to vacate and quash is denied, "(1) the scope of the request be narrowed, and (2) the Court enter a protective order directing that the disclosed materials be maintained as confidential and used only for the pending Dutch proceedings."  (Doc 27 at 18.)

      1.     Scope of Discovery.

      If a district court concludes that a section 1782 application is overbroad, it should consider "whether that defect could be cured through a limited grant of discovery" before denying the request in its entirety.  Mees, 793 F.3d at 302.

      The Upper Brook Companies' application seeks "production of all documents in [JPMorgan's] possession, custody or control, concerning or relating to United States dollar transactions, occurring from 2007 to the present, into and out of" the Rabobank Account.  (Doc 1 at 2-3.)  PIAM seeks to modify the scope of the Discovery "to call only for documents from 2014 forward" because the Upper Brook Companies' claims against PIAM "are based on their allegation that [PIAM] was not entitled to collect its fees starting from 2014."  (Doc 27 at 18-19; Doc 31 at 12.)   PIAM argues that the request "for account records from 2007 to 2014 is based only on [the desire of the Upper Brook Companies] to investigate the possible existence of other 'schemes' to 'divert funds' from their investment accounts."  (Doc 31 at 12.)   The Upper Brook Companies oppose the requested modification and urge that "all of the U.S. dollar transactions" from 2007 to 2014 are relevant to the foreign proceedings.  (Doc 28 at 8, 27.)

      The Court will modify the subpoena so that JPMorgan need not produce documents pertaining entirely to transactions and occurrences prior to January 1, 2013.  The one-year period preceding the otherwise relevant period appears most ample.

2.  <u>Protective Order.</u>

PIAM also seeks a protective order "providing that (1) the documents are to be kept confidential and only used in the pending Dutch proceedings, and (2) at the conclusion of the proceedings, the documents should be destroyed." (Doc 27 at 19.)  PIAM argues a protective order is warranted because the records sought "constitute confidential business and financial records." (<u>Id.</u>); Fed. R. Civ. P. 45(d)(3)(B)(i) (allowing modification of a subpoena if it requires "disclosing a trade secret or other confidential . . . commercial information").

The Upper Brook Companies "object to this proposed protective order to the extent that it seeks to prevent the [their] use of the Discovery in any of the foreign proceedings set forth in the Application." (Doc 28 at 27.)

CONCLUSION

For the reasons explained, PIAM's motion to vacate the April 11 Order and to quash the subpoena issued to JPMorgan is DENIED, except that the Court narrows the temporal scope of the subpoena to the period after January 1, 2013.  The parties shall meet and confer on a proposed protective order limiting use of the Discovery to the proceedings described in PIAM's opposition to the motion and otherwise maintain confidentiality over the documents.  If no agreement is reached, each side may submit a proposed order by January 13, 2023.  The Clerk is directed to terminate the motion. (Doc 24.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        December 23, 2022

23